UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| VICTORIANO G. LOPEZ,<br><br>   Plaintiff<br><br>v.<br><br>NEVADA DEPARTMENT OF<br>CORRECTIONS, et. al.,<br><br>   Defendants | Case No.: 3:17-cv-00732-RCJ-WGC<br><br>**Report & Recommendation of**<br>**United States Magistrate Judge**<br><br>Re: ECF No. 99 |

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment, (ECF Nos. 99, 99-1, 101, 101-1 to 101-4.) Plaintiff filed a response. (ECF No. 108.) No reply brief was filed.

After a thorough review, it is recommended that the motion should be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 78.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC). (*Id.*) Defendants are Dr. Kim Adamson, former NDOC Medical Director Dr. Romeo Aranas, and current NDOC Medical Director Dr. Michael Minev (Dr. Minev is sued in his official capacity only as successor to Dr. Aranas for injunctive relief purposes). Plaintiff

was allowed to proceed with an Eighth Amendment deliberate indifference to serious medical needs claim. (*See* ECF Nos. 93, 95.)

Plaintiff alleges that in he had surgery in July and August of 2012. After the surgery, a stitch was left in one eye for more than four months. Plaintiff was subsequently diagnosed as having cataracts. Plaintiff asked Dr. Adamson to treat his cataracts, but was told that the cataracts would cure themselves within a couple of weeks. Plaintiff alleges that in August of 2017, Dr. Adamson and Dr. Aranas denied follow up care to Plaintiff which caused Plaintiff to lose his vision. Plaintiff filed a grievance, asking to see an eye doctor. Dr. Aranas responded to the second level grievance, stating that Plaintiff saw the optometrist on August 28, 2017, and was diagnosed with keratitis (inflammation of the cornea) and was prescribed prednisolone acetate. Plaintiff avers that this ignored Plaintiff's complaints of suffering and pain as a result of the suture being left in his eye which caused constant pain and continuous itching. His eyes were left sensitive to bright light and bloodshot, with blurry vision and a burning, gritty feeling as if a foreign object is trapped in his eyes. Plaintiff alleges that NDOC's Medical Directive 728 puts corneal transplants and cataract treatment low on the consideration list.

Defendants move for summary judgment, arguing that they were not deliberately indifferent to Plaintiff's serious medical needs, and alternatively, that they are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Eighth Amendment Deliberate Indifference to Serious Medical Needs**

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

4

Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

**B. Medical Evidence**

Plaintiff had eye surgery at the Eye Surgery Center of Nevada on July 11, 2012, August 1, 2012, and August 29, 2012, to remove pterygium, a type of tissue growth over the eyes. (ECF No. 78 at 18-20.)

Dr. Seljestad removed a suture from Plaintiff's left eye on January 16, 2013. A suture was removed from the right eye on March 16, 2013. Plaintiff was prescribed preservative free tears, and instructed to use one drop per hour. (ECF No. 78 at 21.)

Plaintiff saw Dr. Adamson on October 22, 2015, for complaints of dry eyes and irritation. Dr. Adamson assessed him with dry eye syndrome, and Plaintiff was given artificial tears. (ECF No. 101-1 at 2.)

Plaintiff saw an optometrist on June 8, 2016, for complaints of discharge from both eyes. He was assessed with chronic inflammatory conjunctivitis. He was given a prescription for acular ophthalmic solution. (ECF No. 101-2 at 2.)

Plaintiff saw the optometrist again on September 27, 2016, for complaints of reduced visual acuity at a distance. The provider noted the history of acute pterygium and prescribed artificial tears. (ECF No. 101-2 at 2, ECF No. 101-3 at 2.)

Plaintiff sent a kite to see a nurse on April 9, 2017, for pain in his right eye. (ECF No. 101-4 at 2.) It appears that he saw a medical provider that day. (ECF No. 101-3 at 2.)[1]

Plaintiff filed an informal level grievance, assigned grievance number 2006-30-51216-on July 18, 2017. Plaintiff asserted that Dr. Adamson was deliberately indifferent to Plaintiff's serious medical needs because he was aware of Plaintiff's slow loss of vision but failed to treat Plaintiff. Plaintiff stated that in 2012, he was referred for glaucoma surgery, and after surgery a stitch was left in place for four months, which caused him pain. The stitch was subsequently removed. Then, Plaintiff said he was diagnosed with cataracts, which NDOC refused to treat even though he was in pain and losing his vision. Plaintiff noted that he had been sent to Dr. Adamson, who was not an eye doctor, and claimed that the cataracts would heal themselves within a couple of weeks. Dr. Adamson told him that if he lost his vision and stayed in pain it was not an NDOC issue due to costs. Plaintiff asked for corrective medical care and to be sent to see a trained medical provider for his eyes. He included a note that his vision was worse and he could see little out of his right eye, which would constantly tear. The pain in his right eye kept him from sleeping at night. He said he was not given a reason why he could not have cataract surgery other than a reference to cost. (ECF No. 99-1 at 2; ECF No. 78 at 15-17.)

R. Donnelly responded to the informal level grievance on July 28, 2017, stating that Plaintiff would be scheduled to see the eye doctor on the next available clinic day. (ECF No. 78 at 22.)

---

[1] The progress note refers to a "U/O" report, which typically means an unusual occurrence report; however, a copy of this report was not included in Defendants' exhibits.

On August 20, 2017, Plaintiff filed a first level grievance, stating that Dr. Adamson was aware of his ongoing medical issue and promised Plaintiff an appointment for the next clinic day, but the appointment never occurred. (ECF No. 78 at 27.)

On August 28, 2017, he saw the optometrist for decreased visual acuity and pain upon waking up. He was diagnosed with keratitis and cataracts, and was prescribed Prednisolone and was instructed to follow up in two to three weeks. The cataracts were noted as possibly contributing to the decreased visual acuity, but the provider said they did not appear to be 20/80 cataracts. (ECF No. 101-3 at 2.)

On September 28, 2017, K. Hegge responded to Plaintiff's first level grievance, advising Plaintiff he would be scheduled with the eye doctor in the near future. (ECF No. 78 at 28.)[2]

On October 19, 2017, Plaintiff filed his second level grievance, stating that he was always given an indefinite response. (ECF No. 78 at 30.)

On November 14, 2017, Dr. Aranas responded to the second level grievance stating that Plaintiff saw the optometrist on August 28, 2017, and Plaintiff was diagnosed with keratitis (inflammation of the cornea), and was prescribed Prednisolone acetate. (ECF No. 78 at 31.)

Attached to Plaintiff's amended complaint are undated optometry records which note complaints of dry eyes and decreased visual acuity. A history of pterygium was noted. Plaintiff was diagnosed with cataracts, with an indication that it was visually significant in the right eye. The provider recommended cataract extraction in the right eye and prescribed artificial tears. (ECF No. 78 at 24.)

---

[2] It is not clear if Hegge was aware Plaintiff had seen the optometrist the month prior, or if she was referring to another appointment in the future.

**C. Analysis**

Defendants argue that staff promptly responded to Plaintiff's medical complaints and provided appropriate treatment, taking proactive steps to treat his ongoing eye issues.

Plaintiff states that after his eye surgery, to save money, Defendants had an optometrist remove the sutures from Plaintiff's eyes rather than return him to the surgeon for the removal and post-operative follow up. As a result, he had a stitch left in his eye for four months. He claims that this resulted in permanent damage and dry eyes so he cannot read more than a few minutes at a time. Then, he was diagnosed with cataracts and cataract extraction was recommended, but he has had no treatment for his cataracts.

The court views Plaintiff's Eighth Amendment claim as having two components: (1) the denial of treatment for his painful, dry, itchy eyes that resulted from leaving the sutures in his eye for months after his 2012 eye surgery; and (2) the denial of recommended cataract surgery.

Insofar as Plaintiff's Eighth Amendment claim is premised on the denial of treatment of his painful dry, itchy eyes that resulted from the stitch being left in his eye for four months after his surgery, the court finds that Defendants' motion for summary judgment should be granted.

The medical records reflect that Plaintiff had the sutures removed from his eyes by Dr. Seljestad in 2013. There is no evidence that Dr. Adamson (or Dr. Aranas) had any involvement in the decision to remove the sutures months after the 2012 eye surgery. Instead, the medical records reflect that Plaintiff saw Dr. Adamson in October of 2015 for complaints of dry eyes and irritation, and Dr. Adamson assessed Plaintiff with dry eye syndrome and prescribed him artificial tears. There is no evidence of any other complaints (by kite or grievance of otherwise) between October of 2015, and when he saw the optometrist on June 8, 2016, for

complaints of discharge from both eyes. At that point, he was assessed with chronic inflammatory conjunctivitis and was given a prescription solution. He saw the optometrist again a few months later, in September of 2016, for complaints of decreased visual acuity, and the provider prescribed artificial tears. There is no evidence of other complaints about his eyes until April 9, 2017, when Plaintiff filed a kite to see a nurse about pain in his right eye. He filed his grievance a few months later, in July of 2017. Plaintiff saw the optometrist on August 28, 2017, for decreased visual acuity and pain. He was diagnosed with keratitis and cataracts and was prescribed Prednisolone and was instructed to follow up. Dr. Aranas' only direct involvement appears to be his response to Plaintiff's second level grievance, noting that Plaintiff had seen the optometrist and received treatment on August 28, 2017. There is no evidence of any further communication with Dr. Aranas or Dr. Adamson on the issue of painful, dry, itchy eyes attributed to leaving the sutures in following surgery.

 In sum, Defendants are correct that the evidence reflects that Plaintiff received responsive treatment for his complaints of painful, dry and itchy eyes between 2015 and 2017. Plaintiff does not provide evidence that he communicated further with Dr. Adamson or Dr. Aranas about the issues he attributes to the sutures being left in his eyes. Therefore, summary judgment should be granted in Defendants' favor with respect to this aspect of Plaintiff's Eighth Amendment claim.

 With respect to the cataracts, again, it is unclear when Plaintiff was first diagnosed with cataracts as the optometry records attached to his complaint are undated, but the progress note from August 28, 2017, does note the cataract diagnosis, with a notation that it was possible this was contributing to his decreased visual acuity. The undated records indicate that the cataract was visually significant in the right eye.

Defendants' motion does not specifically address the cataract diagnosis, or Plaintiff's allegations that he requested cataract extraction but that request was denied. Their statement of undisputed facts does not even mention the cataract diagnosis or recommendation for cataract extraction. (*See* ECF No. 99 at 2-3.)

Plaintiff, on the other hand, states in his affidavit that he asked Dr. Adamson to have the cataracts removed, and Dr. Adamson told him that the cataracts would cure themselves within a couple of weeks. (ECF No. 108 at 25 ¶ 5.) This is consistent with the statement in his informal level grievance. Moreover, Plaintiff raised the issue of the cataract surgery denial in his grievance. Dr. Aranas reviewed the grievance, and responded about Plaintiff being seen by the optometrist and receiving a prescription for Prednisolone, but does not mention anything about the cataract diagnosis or Plaintiff's contention that he had been denied recommended cataract surgery.

Plaintiff's affidavit and amended complaint also reference NDOC regulations and medical directives, which he claims Defendants were responsible for promulgating and/or implementing that likely resulted in the denial of cataract surgery. Defendants do not address the alleged denial of cataract surgery; therefore, the court cannot determine whether the denial was due to a policy such as cost, as Plaintiff suggests, or some other reason.

Defendants argue that they were responsive to Plaintiff's medical needs, but ignore the aspect of his claim that asserts he was denied recommended cataract extraction. Therefore, Defendants have not met their burden of demonstrating that there is no genuine dispute of material fact and they are entitled to summary judgment as a matter of law with respect to this aspect of Plaintiff's Eighth Amendment claim. Their motion should be denied insofar as Plaintiff

alleges that they violated the Eighth Amendment by refusing his request for recommended cataract surgery.

**D. Qualified Immunity**

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)).

Defendants argue that they did not violate Plaintiff's rights, or if there was a violation, the rights were not clearly established. Plaintiff, on the other hand, argues that the rights were clearly established in *Colwell v. Bannister*.

Here, there is insufficient evidence in the record to determine whether Defendants violated Plaintiff's constitutional right because Defendants did not address Plaintiff's request for the recommended cataract surgery.

In any event, the court agrees with Plaintiff that it was clearly established in 2014, via *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014), that cataracts constitute a serious medical need, and that denial of recommended cataract surgery because of an administrative policy rises to the level of deliberate indifference. Since Defendants did not specifically address the issue of the recommendation for cataract surgery, the court cannot determine on the record before it whether the denial was due to administrative policies or for some other reason. At this juncture, they have not demonstrated they are entitled to qualified immunity.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' Motion for Summary Judgment (ECF No. 99) as follows:

(1) the motion should be **GRANTED** insofar as Plaintiff's claim is premised on denial of treatment related to issues he attributes to having sutures left in his eyes for months after his 2012 eye surgery; and

(2) the motion should be **DENIED** insofar as Plaintiff's claim is premised on a denial of recommended cataract surgery.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 22, 2021

_William G. Cobb_
William G. Cobb
United States Magistrate Judge

13